UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

NORBERTO P. PENA,

                       Plaintiff,                    No. 05-CV-6048 CJS

     -vs-

                                                DECISION AND ORDER

AUTOMATIC DATA PROCESSING, INC.,
METROPOLITAN LIFE INS. CO.,

                       Defendant.

_____

APPEARANCES

For plaintiff:                 Lawrence I. Heller, Esq.
                             1 East Main Street, Suite 950
                             Rochester, New York 14614

For defendants:            Hugh M. Russ, III, Esq.
                             Catherine Grantier Cooley, Esq.
                             Hodgson Russ LLP
                             One M&T Plaza, Suite 2000
                             Buffalo, New York 14203-4000

INTRODUCTION

This is an action pursuant to the Employee Retirement Income Security Act

("ERISA"),  29 U.S.C. § 1001, *et seq.*, in which plaintiff alleges that defendant unlawfully

terminated his long-term disability insurance payments.  Now before the Court is the

defendants' motion [#10] for summary judgment and plaintiff's cross-motion [#16] for the

same relief.  For the reasons that follow, defendant's motion is granted and plaintiff's

cross-motion is denied.

BACKGROUND

Unless otherwise noted, the following are the facts of this case, viewed in the light most favorable to plaintiff Norberto Pena ("plaintiff").  Plaintiff, who was then living in the vicinity of New York City, began to experience low back pain in November 1993 after he bent over to pick up change from the floor.  An MRI of plaintiff's lower back taken on November 2, 1993 showed "possible Grade I retrololisthesis of L5 over S1", "markedly degenerated L5-S1 disk", a "small disk bulge and subligamentus disk herniation at L5-S1", and "no evidence of spinal stenosis [narrowing or constriction]".  A neurologist subsequently examined plaintiff on December 2, 1993, and concluded that plaintiff had "lumbar radiculopathy secondary either to an extruded disc fragment, foraminal stenosis, or compression of the nerve root on the left."  The neurologist recommended physical therapy and told plaintiff to avoid "heavy lifting, bending, twisting, turning, or straining."  A myelogram performed on January 21, 1994 showed, at L4-5, "small left posterolateral spur resulting in minimal left neural foraminal narrowing", and at L5-S1, "mild degenerative changes and mild right neural formaminal narrowing."  A second MRI taken on November 17, 1994 showed "dessication and loss of height of the intervertebral disc at L5-S1 with osteophyte and/or disc material seen effacing the ventral thecal sac."  An EMG and nerve conduction study performed on November 18, 1994 was abnormal in that plaintiff's "left tibial H-reflex" was absent.  The EMG and nerve conduction testing also showed "denervation present in the left L4 through S1 myotomes as well as to a lesser degree in the right L5 myotome", which findings were "consistent with a lumbosacral polyradiculopathy involving mainly the left S1 nerve root and to a lesser degree the right and left L5 nerve root and the left L4 nerve root."

2

Plaintiff claimed to be completely unable to work as a result of his back pain, and he began receiving long-term disability payments through Prudential Insurance Company beginning in October 1995.  Under the portion of the policy that is relevant to this action, a claimant, to be considered disabled, must be unable "to engage in any work or occupation for which he/she is reasonably fitted by education, training or experience."

In or about December 1998, plaintiff moved to Rochester, New York, and began treating with a new primary care physician, David P. Stornelli, M.D. ("Stornelli").  Plaintiff saw Stornelli for an initial visit on December 23, 1998, at which time he told Stornelli that he was "barely able to ambulate."  Stornelli examined plaintiff and made the following notes: "[Patient] periodically winces in pain . . . .  I[t] took him approximately 3 minutes to get into a standing position from the chair.  He was unable to stand up straight, preferring to be bent over forward.  When attempting to bend forward to touch his toes, he collapsed to the floor in agony."  Stornelli further noted:

> The findings on physical exam do not correlate with the severity of pain reported by Mr. Pena.  For him to have pain significant enough to cause him to collapse to the floor from a herniated disc, I would expect some diminished reflexes in his [lower extremities].  He has normal reflexes, normal sensation, an normal muscle bulk bilaterally which argues against a chronically herniated disc.  I believe there is an element of drug-seeking behavior in this patient.

(Stornelli December 23, 1998 report).  Stornelli saw plaintiff again six months later (May 21, 1999) and noted that plaintiff was "ambulating better", and that plaintiff reported feeling better, while still experiencing daily pain.  Plaintiff told Stornelli that he had been taking Valium and Darvocet that he obtained from family members.

During an office visit in August 1999, plaintiff told Stornelli that he had been in an

3

automobile accident, which caused him neck and shoulder pain and exacerbated his low-back pain.  Plaintiff also stated that he was taking Vicodin that he obtained from a family member.  Stornelli noted that an x-ray showed "no fractures and mild DJD [degenerative joint disease]".  Stornelli refused to prescribe narcotic medications.  Due to plaintiff's complaints of neck pain, Stornelli referred him to have an MRI of his cervical spine.  The MRI showed "small" disc bulges at the C3-5 and C4-5 levels, without "significant impressions on the thecal sac", and with "no evidence of spinal stenosis or significant foraminal narrowing".  The MRI further showed "mild degenerative disc disease" at the C5-6 and C6-7 levels "without evidence of spinal stenosis".

Plaintiff saw Stornelli again on November 5, 1999, complaining of continuing neck and back pain.  Stornelli noted, at that time, that plaintiff had not complied with his recommendation to try physical therapy.  Stornelli also reported that plaintiff had not been taking the medications that he had prescribed, and instead was taking Percocet that he had "from a prior physician".  Stornelli found no tenderness of the cervical spine, and found plaintiff's reflexes and strength to be normal.  Stornelli wrote:

> [A]s previously, I suspect that there is a large component of narcotic seeking behavior going on here.  I also suspect that there may be litigation going on involving the car accident.  The MRI of his cervical spine which we checked at the last visit did not show any significant disc herniation, spinal stenosis or nerve route compression to explain his symptoms.

Stornelli referred plaintiff to a pain treatment center for evaluation.  However, two months later, Stornelli noted that plaintiff had not followed through with the referral.  Stornelli also noted that plaintiff was not taking the medication that he had prescribed and was instead still taking narcotic medications obtained from family members.  Stornelli continued to decline to prescribe narcotics for plaintiff's pain.

4

Plaintiff was evaluated by Jaimala Thanik, M.D. ("Thanik") at the Pain Management Center on February 10, 2000.  Thanik observed that plaintiff "appeared in extreme pain and was continually having body jerks indicating pain and spasm".[1]  Thanik observed that plaintiff "does have evidence of degenerative disease of the lumbar spine, and this may be a component of L5-S1 radiculopathy.  He has, however, developed a strong chronic pain syndrome, which is complicating his pain as well as his response to treatments."  Thanik recommended a "multi-disciplinary pain management program", subject to plaintiff being evaluated by a behavioral psychologist.  Thereafter, plaintiff was examined by psychologist, Michael Kuttner, Ph.D. ("Kuttner"), who concluded that plaintiff was not a good candidate for the treatment suggested by Thanik, stating, in relevant part, that plaintiff "has a long-standing history of chronic pain.  He has no goals or motivation to change.  It would take a great deal of effort to engage in behavioral pain self-management skills, and, at this point, Mr. Penal does not appear to be a good candidate."

Stornelli saw plaintiff again a short time later, and reported that he agreed with Thanik and Kuttner that there was "a strong component of pain behavior with psychological overlay."  Stornelli had plaintiff undergo a nerve conduction study, which showed "a left C7 cervical radiculopathy", though Stornelli opined that a myelogram would be necessary to "better delineate the anatomic abnormality".

Plaintiff was examined by a neurologist, Shige Okawara, M.D. ("Okawara"), on April 7, 2000.  Okawara reviewed the MRI from 1999, and concluded that, despite the

---

[1]Stornelli made no such observations when he saw plaintiff three days earlier.

presence of small disc bulges, there was no indication of "nerve root compression, spinal stenosis or dislocation".  After examining plaintiff, Okawara's impression was "left shoulder bursitis", noting that there was "no clear cut nerve root compression sign, except subjective sensory decrease of the three fingers of his left hand."  Okawara had a new MRI performed, which showed no changes from the 1999 MRI.  The radiologist who reviewed the new MRI stated that, "No signal abnormalities are identified within the cervical or visualized upper thoracic spinal cord."  Okawara concluded that no surgical treatment was indicated, and he recommended that plaintiff be seen for an orthopedic evaluation of his shoulders.

When Stornelli saw plaintiff again in October 2000, plaintiff was complaining of pain in his neck, left shoulder, left arm, and right hand.  Stornelli observed that plaintiff was "contin[uing] to display chronic pain behavior frequent grimacing, slowness to rise from a chair and antalgic gait."  Stornelli stated, "I still do not have any objective data to determine a diagnosis to explain his chronic pain.  He does however have an abnormal nerve conduction study and what sounds like neuropathic pain therefore [I] will try Neurontin 300 mg tid."

In November 2001, Stornelli reported that plaintiff was still complaining of neck and back pain, and that plaintiff was taking "Advil/Tylenol #3/Percocet" that he was obtaining from his brother.  Stornelli wrote: "Clearly there continues to be some exaggeration of sxs [symptoms] + drug seeking behavior."

In November 2002, Metropolitan Life Insurance Company ("MetLife") took over the administration of plaintiff's long-term disability benefits from Prudential Insurance.  At that time, MetLife wrote to plaintiff and informed him of this change, and asked him to

6

submit updated information for his file, including a personal profile evaluation, recent medical records, and an Attending Physician Statement.  Plaintiff completed the Personal Profile, stating that his disabling condition was "pain in my spine, left leg, lower back[.] This pain is constant."  Plaintiff described his daily routine as follows: "Watch t.v., read, lay down, because prolonged standing or sitting causes pain in my spine and lower back and neck."  Plaintiff further stated that he was "in bed almost all the time."  Plaintiff indicated that he was able to drive an automobile, but that "all trips are short distance 5-10 min. if longer someone else drives for me [sic]."

As for the Attending Physician Statement requested by MetLife, Stornelli completed a report on January 15, 2003.  In the report, Stornelli stated that plaintiff could sit intermittently for four hours per day, could stand intermittently for two hours per day, could walk intermittently for one hour per day, and was unable to climb, twist, bend, stoop and reach above shoulder level or operate a motor vehicle.  Stornelli reported that plaintiff was able to occasionally lift up to 20 pounds.  Despite these conclusions, Stornelli reported that plaintiff was able to work "0" hours per day.

Plaintiff went to see Stornelli again on May 5, 2003, at which time he reported that he was "doing a little bit better", although he still complained of daily neck and back pain. Stornelli observed that plaintiff's gait was "unremarkable."  The same day, Stornelli completed another form report for MetLife.  This report, though, differed from the earlier report.  Most notably, Stornelli stated, despite plaintiff's claim to be "doing a little better", that plaintiff was completely unable to sit during an 8-hour workday.  He further stated that plaintiff could only stand for two hours and sit for two hours during an 8-hour workday, could only occasionally lift up to ten pounds, and could not use his left hand for

7

grasping, pushing, pulling, or manipulating.  Stornelli added a handwritten remark that plaintiff was "very limited due to chronic neck + back pain".

In connection with plaintiff's alleged disability, MetLife had arranged to have plaintiff surveilled by a private investigator on the 12th, 14th , 27th and 29th of May, 2003. The investigator made written reports of his observations and also took video footage of plaintiff.  On May 12, 2003, the investigator observed plaintiff getting into and out of his vehicle, and driving to two locations in the City of Rochester.  The investigator reported, and the video shows, that each time plaintiff entered and exited his vehicle, he did so via the passenger's side door, and then slid across to the driver's seat, "without any signs of physical limitations."  On May 14, 2003, the investigator observed plaintiff bending at the waist while "work[ing] on a motorcycle" at his home, and then saw him get into his car and drive away.  On May 27, 2003, the investigator observed plaintiff drive his vehicle to two different homes in the City of Rochester, and then observed him enter and exit a post office and go shopping.  Upon returning from shopping, the investigator videotaped plaintiff removing groceries from his vehicle, a Jeep Cherokee.  The videotape shows plaintiff reaching up with his left arm to close the overhead rear hatch of the Jeep, and then walking away carrying groceries in his arms.  On May 29, 2003, the investigator observed plaintiff and another man enter plaintiff's vehicle and drive to various locations in the City of Rochester.  The video shows plaintiff bend over and lean into the Jeep through the passenger's door to retrieve what appeared to be a stereo or some type of sound equipment from the rear of the vehicle.

Subsequently, MetLife had plaintiff's medical records, his personal profile report, and the results of the surveillance sent to a consulting physician, John D. Thomas, II,

8

M.D. ("Thomas").  Thomas reviewed the materials and completed a report in which he

stated, in relevant part:

> Keeping in mind the entire set of information reviewed . . . it would appear
> to me, speaking as a board certified practitioner in physical medicine and
> rehabilitation, that Mr. Pena has likely retained, [sic] sedentary to light duty
> work ability, on a full-time basis.
>
> This file contains may 'red flags.'  Beginning with the initial intake note, Dr.
> Stornelli, 12/23/98- significant [sic] pain behaviors are noted and a
> question is raised of drug seeking motivation.  This theme continues right
> up to the present time.  Dr. Stornelli does not supply narcotics, yet Mr.
> Pena has access to them and uses them- which he tells Dr. Stornelli.  He
> supposedly reads and watches television, sitting for short periods of time
> and then lying down for the bulk of his day.  This is not evident on
> surveillance.
>
> We do not have recent, confirmatory objective testing about the low back
> and lower extremities, yet some restrictions are cited.  We do have quite a
> bit of testing about the upper quarters . . . and there are no significant
> lesions or issues spoken of.  Certainly there are some degenerative
> changes and there is a bit of inflammation, slight or mild, C7 to the left at
> the nerve root level.  This, in all likelihood, would not render the left upper
> extremity useless.
>
> Mr. Pena was rejected by pain management and behavior management
> services.  He was sent away by neurosurgery.  Dr. Stornelli is left to try and
> assist him, as best he can.  Dr. Stornelli appears to be doing a very
> conscientious job and does not readily offer a steady supply of narcotics.
>
> Dr. Stornelli responds to functional questionnaires in a very limited fashion,
> it is true.  Must be remembered that he is [an] internist and does not have
> a practice focusing in on functional activities and functional testing.  He is
> simply trying to guide Mr. Pena along, appropriately, for his regular care
> and pain needs.  The recent PCE form notes two hours standing and two
> hours walking ability in an eight-hour work shift.  Again this is not
> corroborated on surveillance.  States there is no sitting ability; this is
> refuted by surveillance.  Can lift and carry 10 pounds.  Can use feet.  Can
> bend and squat occasionally.  Can drive.  These latter activities are
> affirmed by surveillance. [Though he allegedly] [c]an use the right upper
> extremity/hand only - this is not illustrated on surveillance.
>
> Therefore, once again, speaking as a board certified practitioner in
> physical medicine and rehabilitation, Mr. Pena apparently has chronic pain

9

and does engage in drug-seeking behaviors.  He displays significant pain behaviors.  He is, apparently, more physically active and capable than he would disclose to Dr. Stornelli.  He has very likely retained sedentary to light duty full-time return to work ability.

Based upon the surveillance and Thomas' report, MetLife terminated plaintiff's disability payments on August 31, 2003.  In the letter notifying plaintiff that his benefits were being terminated, MetLife stated, in relevant part:

> We observed your activities on May 9, 12, 14, 27, 29, 2003.  On May 12, 2003 you were observed driving.  On May 14, 2003 you were observed working on a motorcycle and driving.  On May 27, and 29, 2003 you were observed driving, visiting a post office, shopping, etc. on May 29 2003 [sic] you were observed driving with a passenger, you made multiple stops. During our observation you did not display any visual signs of pain or discomfort.
>
> On July 1, 2003 we had your file reviewed by John D.Thomas II, M.D., an Independent Physician Consultant Board Certified in Physical Medicine and Rehabilitation.  Dr. Thomas indicated that based on his review of the information on file, you have likely retained, [sic] sedentary to light work ability, on a full-time basis.
> ***
> The information on file does not support a condition severe enough to keep you from working.  Based on this information we have determined that you no longer meet the definition of disability as defined in the group plan. There we must terminate your claims for Long Term Disability and Optional Life benefits effective September 1, 2003.

MetLife further advised plaintiff that he could appeal this decision.

Upon having his payments terminated, plaintiff apparently went to Stornelli and requested that Stornelli provide clarification regarding his suspicion of plaintiff's "drug-seeking behavior".  Stornelli provided a statement on October 13, 2003, in which he downplayed his 1999 comments suggesting drug-seeking behavior and stated that "longitudinal follow up over the subsequent 4 years has not borne out that concern." However, as noted above, as late as November 2001 Stornelli wrote that he still believed

plaintiff was engaged in drug-seeking behavior.  Also apparently in response to the

termination of plaintiff's benefits, Stornelli referred plaintiff to see an orthopedic

specialist, David Speach, M.D. ("Speach").  Speach reported on September 15, 2003

that plaintiff's disability benefits had been terminated, and that plaintiff was "upset" and

had retained an attorney.  Speach's initial assessment was "neck pain", "left cervical

radiculopathy", and "lumbosacral polyradiculopathy based on electrodiagnostic studies in

1994".  Speach further indicated that he would defer making a final assessment until

after a new MRI was performed, and that he would discuss plaintiff's disabilitiy status

with him after the MRI.  On September 30, 2003, Speach reported that the new lumbar

MRI showed "degenerative changes predominantly at the L5-S1 level where there is disc

dessication and secondary osteophyte formation.  There is no significant canal stenosis

or foraminal stenosis.  There are mild changes at the L4-L5 level.  The remaining disc

levels appear normal."  Speach recommended that plaintiff "retry a pain management

program."  Significantly, Speach made no reference to plaintiff's alleged disability.

Plaintiff appealed MetLife's decision to terminate his benefits by letter dated

October 6, 2003.  Regarding the surveillance report and video, plaintiff stated that the

video demonstrated that he was in pain: "My walking [on the video] is slow and

controlled and you even see me gimp to the left."  Plaintiff further stated that he was not

performing mechanical work on the motorcycle, as suggested by the surveillance report,

but was only attaching a ribbon to the motorcycle, which was a gift for his son.

Regarding his ability to close the hatch of his Jeep, plaintiff stated: "[O]ne can see that I

have difficulty closing my trunk as well as walking slow and protective due to pain."  It

does not appear that plaintiff submitted Speach's reports to MetLife at this time.

11

On November 3, 2003, a MetLife representative made a notation in the

company's file pertaining to plaintiff's claim, in relevant part as follows:

> DX of lumbar and cervical spine degenerative disease.  PCE completed by
> EE's AP indicated severe restrictions/limitations.  Surveillance and IPC
> review was performed.  Surveillance revealed the EE to be active and the
> IPC opinion was that EE was capable of sedentary to light full time work
> ability.  Claim was terminated.
>
> On appeal: No new medical received.  File was reviewed by NC and VOC.
> Since the surveillance and IPC was not shared with the EE's physician nor
> did we obtain correct and current restrictions/limitations from his physician
> after viewing the tape/IPC report we are unable to determine if his ETE
> meets the definition of disability.  Claim being referred back to the unit as
> reversal without benefits for additional medical management, review and
> determination.

A subsequent note in the file on November 6, 2003, states: "Manager reply- claim being

returned from appeals w/no reversal.  Suggest we send video and IPC report to AP for

any comments or findings as suggested by appeal staff."

MetLife followed that recommendation and sent the video surveillance and

Thomas's report to Stornelli on December 8, 2003, along with a letter stating, in relevant

part:

> On July 1, 2003 we had Mr. Pena's file reviewed by John D. Thomas II,
> M.D., an Independent Physician Consultant Board Certified in Physical
> Medicine and Rehabilitation.  We have attached a copy of Dr. Thomas'
> report for your review, and a copy of our observation of Mr. Pena's
> activities in May 2003.
>
> Please review this information.  If you are not in agreement with the
> Medical Consultant's findings please provide our office with your
> comments to verify your patient's degree of impairments and provide
> objective diagnostic and/or clinical medical evidence that will support your
> findings.
>
> If we do not receive a response within the next two weeks we will assume
> that you are in agreement with these findings.

MetLife also sent a copy of this correspondence to plaintiff.  Subsequently, plaintiff contacted MetLife and stated that he had discussed the matter with Stornelli, and that Stornelli disagreed with Thomas's report.  Nonetheless, Stornelli never responded to MetLife.  Apparently being unable to obtain a responsive letter from Stornelli, plaintiff submitted to MetLife copies of Speach's reports from September 2003.  MetLife wrote to plaintiff on February 17, 2004, and advised him that it was upholding its previous decision to terminate his disability insurance benefits.  MetLife's letter noted that Stornelli had never submitted a response, though it acknowledged receiving additional medical information that plaintiff had submitted on January 15, 2004, apparently referring to Speach's reports.  MetLife stated that the additional information had been reviewed by a "Healthcare Professional", and that MetLife had "determined that the medical documentation does not support a disability that would prevent you from engaging in any work or occupation, as defined by the plan.  Therefore, the original claim determination was appropriate."

Thereafter plaintiff commenced this action, claiming that he is disabled according to the terms of the subject policy, and that defendant's decision to terminate his benefits was arbitrary and capricious.  Following discovery, the parties filed the subject motions for summary judgment.  Counsel for the parties appeared before the undersigned for oral argument of the motions on June 1, 2006.  The Court has thoroughly reviewed and considered the parties' submissions, the comments of counsel, and the entire record in this action.

ANALYSIS

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light

14

most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment is appropriate only where, "after drawing all reasonable inferences

in favor of the party against whom summary judgment is sought, no reasonable trier of

fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d

Cir.1993).

Pursuant to ERISA, a plan participant may sue "to recover benefits due to him

under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify

his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B).

The principles of law applicable to such ERISA claims are well settled:

> [A] denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be
> reviewed under a de novo standard unless the benefit plan gives the
> administrator or fiduciary discretionary authority to determine eligibility for
> benefits or to construe the terms of the plan.  Thus, where the written plan
> documents confer upon a plan administrator the discretionary authority to
> determine eligibility, we will not disturb the administrator's ultimate
> conclusion unless it is "arbitrary and capricious."

*Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (citations omitted).

When applying the arbitrary and capricious standard of review, courts

> may overturn a decision to deny benefits only if it was without reason,
> unsupported by substantial evidence or erroneous as a matter of law.  This
> scope of review is narrow, thus we are not free to substitute our own
> judgment for that of the [plan administrator] as if we were considering the
> issue of eligibility anew.

*Id*. at 442 (citations omitted).  In this regard, substantial evidence is "such evidence that

a reasonable mind might accept as adequate to support the conclusion reached by the

decisionmaker and requires more than a scintilla but less than a preponderance." *Miller*

*v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (citation and internal

quotation marks omitted).  Moreover, "if upon review a district court concludes that the Trustees' decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality'." *Id.* at 1071; *see also, Zervos v. Verizon New York, Inc.*,  277 F.3d 635, 648 (2d Cir. 2002) ("[A] remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable.") (citation and internal quotation marks omitted).

With regard to the evaluation of medical evidence by a plan administrator, it is further well settled that

> ERISA . . . requires that plan procedures 'afford a reasonable opportunity ··· for a full and fair review' of dispositions adverse to the claimant. § 1133(2). Nothing in the Act itself, however, suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-831, 123 S.Ct. 1965, 1970 (2003).  However, a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*, 538 U.S. at 834, 123 S.Ct. at 1972.  Furthermore, under ERISA, a plan administrator should consider a claimant's subjective complaints of pain. *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) ("It has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability.") (citation and internal quotation marks omitted).

16

Turning to the subject case, the parties agree that the Court must apply the arbitrary and capricious standard of review to defendant's decision to terminate the payment of benefits to plaintiff.  Nevertheless, plaintiff contends that defendant's decision was arbitrary and capricious for a variety of reasons.  Plaintiff argues that defendant should not have relied on Thomas's report, since Thomas never examined him.  Plaintiff also maintains that Thomas's opinion that he "likely" retained the ability to work does not amount to substantial evidence.  Plaintiff states that the video footage, if anything, confirms that he is disabled, and he further alleges that defendant's decision to terminate his benefits after ten years, as well as its decision to have him surveilled, as opposed to having him examined by a physician, demonstrate bad faith.  The Court has considered all of plaintiff's arguments and finds that they lack merit.  Again, the issue before the Court is simply whether defendant's decision was arbitrary and capricious. The Court finds that it was not. In that regard, for example, the Court has reviewed the video footage and agrees that plaintiff's movements appear inconsistent with the limitations that he reported both to MetLife and to Stornelli.  While Stornelli reported that plaintiff was unable to sit, to reach above shoulder level, or to use his left hand for grasping, the surveillance report and accompanying video establish that plaintiff was able to sit in his car while driving, and to use his left arm and hand to reach above his head to close the rear hatch of his Jeep Cherokee.  On the video, plaintiff appeared to move quickly with a normal gait.  Moreover, Stornelli's opinion that plaintiff was unable to work was reached before he was provided with the video surveillance and Thomas's report.  After being sent those items, Stornelli failed to make any further submission in support of plaintiff's claim.  And as already discussed, Stornelli's earlier attempt to

17

downplay to MetLife his suspicions that plaintiff was exaggerating his symptoms and seeking drugs is refuted by his own office notes.

Plaintiff's most compelling argument is that MetLife's internal file entry dated November 3, 2003, suggests that it did not believe that plaintiff was able to work when it terminated his benefits.  Despite counsel's impassioned plea on this point during oral argument, the Court rejects this idea.  Unlike plaintiff, the Court does not read the November 3rd entry to state that MetLife was uncertain about plaintiff's ability to work, based upon the information in its file at the time.  Rather, the Court reads the entry to express only the writer's view that MetLife should, before deciding plaintiff's appeal, give Stornelli a chance to review the video footage and Thomas's report, and to submit additional medical evidence.  MetLife subsequently did just that, and as discussed above, Stornelli did not respond despite being told that MetLife would treat his failure to respond as showing agreement with MetLife's decision.  Consequently, the Court does not agree with plaintiff's characterization of the November 3rd entry as a "smoking gun" evidencing bad faith.

CONCLUSION

For all of the foregoing reasons, defendants' motion [#10] for summary judgment is granted in its entirety and plaintiff's cross-motion [#16] for the same relief is denied. The Clerk of the Court is directed to close this case.

Dated: Rochester, New York
      June 15, 2006                     ENTER:


                                 /s/ Charles J. Siragusa
                                 CHARLES J. SIRAGUSA
                                 United States District Judge